UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

| | |
|---|---|
| RURAL CELLULAR CORPORATION, d/b/a VERIZON WIRELESS, | 1:25-CV-01010-ECS |
| Plaintiff, | |
| | OPINION AND ORDER GRANTING TEMPORARY RESTRAINING ORDER |
| vs. | |
| SLB MILBANK, LLC, | |
| Defendant. | |

On June 30, 2025, Plaintiff Rural Cellular Corporation, doing business as Verizon Wireless, filed a verified complaint alleging (1) that Defendant "SLB Milbank has repeatedly attempted to force Verizon to pay exorbitant and unsubstantiated sums of money for alleged past electrical use" at a property on which Verizon operates a federally licensed and regulated rooftop telecommunications facility and (2) that Defendant "has twice shut off electrical service to Verizon's" communications facility "when Verizon did not give into [Defendant's] demands." Doc. 1 ¶ 2. Plaintiff's Complaint seeks both declaratory judgment and a permanent injunction. Id. ¶¶ 10, 11.

On July 1, 2025, Plaintiff moved for a temporary restraining order ("TRO") and preliminary injunction. Doc. 5. Specifically, Plaintiff asks this Court to preserve the status quo by enjoining Defendants from (1) terminating electrical service to the property on which it operates the rooftop telecommunications facility, (2) otherwise interfering with Plaintiff's equipment or lawful operations on the property, or (3) failing to restore and preserve the status

quo of the parties contractual relationship pursuant to the Communications Facility Agreement ("Agreement") until this litigation has been resolved.  Doc. 5-1 at 2.  Plaintiff has submitted a draft TRO covering these three requests.  Id.

## I.  Facts as Alleged in Verified Complaint

In 2007, Verizon entered an Agreement with Milbank Insurance Company permitting "it to install and operate a communications facility on a portion of the roof of a building located at 107 Flynn Drive, Milbank, South Dakota 57252 (the 'Property')."  Doc. 1 ¶¶ 7, 8.  In January 2020, Defendant acquired the building and became Verizon's new landlord under the Agreement.  Id. ¶ 8.  In July of that year, Defendant "assigned certain of its interests in and to the Agreement to Crown Castle AS LLC ('Crown')."  Id.  Despite this assignment, Defendant "still owns the Property and retains the obligation to provide power to the Property under the Agreement."  Id.

Verizon's rooftop communications facility "is licensed and regulated by the Federal Communications Commission ('FCC') and provides . . . telecommunications services to a region exceeding 25 square miles," including the City of Milbank.  Id. ¶ 9.  Verizon's market share in the State of South Dakota is around 62 percent.  Id. at 10.  The rooftop communication facility "offers the most wireless coverage and the highest user capacity in the Milbank area," which includes Grant County, South Dakota; the Milbank School District; and many other businesses. Id.

Section 5 of the Agreement provides:

Lessee [Verizon] shall pay for all utilities used for its Facility.  Lessee shall install at Lessee's cost a separate meter to measure its electrical use and pay the service provider directly or Lessee shall install at Lessee's cost a submeter to measure its electrical use, in which case Lessee shall pay to Lessor [SLB Milbank], or, if possible, to the service provider directly, all amounts for Lessee's service when billed by Lessor or the service provider.

2

Id. ¶ 12; Doc. 1-1 at 1. Verizon's communication facility uses electrical power supplied to the Property by Otter Tail Power Company. Doc. 1 ¶ 14. The power company bills Defendant for the entire Property's electrical use, "including those attributable to Verizon's communication facility." Id. But Verizon has equipped its facility with a submeter that measures the facility's individual electrical use. Id.

Before Defendant acquired the Property, the previous owner used the submeter to measure Verizon's electrical use and then billed Verizon for the portion of the electric bill attributable to its communication facility. Id. ¶ 15. The owner's invoices were sent to a third-party vender that Verizon employs to process and pay the invoices. Id. In the twenty-four months just before Defendant's purchase of the property—from January 1, 2018 through December 31, 2019—the average monthly cost of Verizon's electrical use was $424.17. Id. ¶ 26.

On October 5, 2020, Defendant sent Verizon an invoice seeking reimbursement for nine months of electrical charges—a total of $4,512.97. Id. ¶ 16. Verizon's third-party vendor processed the invoice and sent Defendant a check, but it was never cashed. Id. This was the only invoice for electrical charges that Verizon received from Defendant until May 2025. Id.

"Since 2020, SLB Milbank's owner, Ross Lerner," has orally demanded payment for undisclosed electrical charges. Id. ¶ 17. "Verizon instructed [Lerner] to submit invoices for these" charges to its third-party vendor, as he did in 2020. Id. But Lerner has not done so. Id.

In May 2025, Verizon learned that Otter Tail Power Company had sent a disconnection notice to Lerner for nonpayment of electrical bills at the Property. Id. ¶ 18. Because Verizon's rooftop communications facility at the Property provides critical telecommunications infrastructure to "thousands of customers, Verizon contacted" the power company and paid Defendant's "outstanding balance of $16,940.12." Id. Later that month, Defendant's legal

3

counsel sent Verizon's attorney an invoice for electrical charges for the months of May 2024 through April 2025. Id. ¶ 19. The invoice sought $37,440.08. Id. Despite the invoice noting that Defendant "would submit additional invoices for prior years on June 15, 2025," Verizon has received no additional invoices. Id.

In the early afternoon of June 19, 2025, without notice or warning, Defendants disconnected power to the Property, causing Verizon's communication facility to operate on a back-up battery. Id. ¶ 20. The battery, however, was only a short-term solution—the battery "was depleted within a few hours." Id. By early evening, Verizon was again without power, and its rooftop communication facility could no longer service its customers. Id.

Legal counsel for Verizon contacted Defendant's attorney and demanded that power be restored to the Property. Id. ¶ 21. Soon after, Verizon sent Defendant a letter demanding that power be restored; "offering to settle all outstanding amounts claimed by [Defendant] for $37,440.08; and requesting that [Defendant] allow [Otter Tail Power Company] to install a direct power connection to Verizon's equipment, which would eliminate the need for [Defendant] to incur charges for Verizon's communications facility." Id. Power was eventually "restored to the Property" around 8:00 p.m. Id.

Representatives for the parties then held "a two-hour conference call in an attempt to settle the outstanding issues, but [Defendant] refused to accept" Verizon's terms. Id. ¶ 22. Verizon then "requested that [Defendant] submit a written response and counterproposal" to Verizon's earlier offer. Id. The next day, however, Defendant "once again disconnected power to the Property," instructing the Otter Tail Power Company "to permanently disconnect service to the entire building." Id. ¶ 23. Shortly after that, Defendant sent Verizon a counterproposal demanding "$216,018.08 for alleged past electrical service charges dating back to February

4

2020." Id. ¶ 24.  This amount included the $37,440.08 that was invoiced on Jun 15, 2025, as well as a request for an additional "$178,578.00 for the months of February 2020 through April 2024." Id.  Defendant's counterproposal did not provide any supporting documentation "identifying the amount of power usage specifically attributable to Verizon['s]" communication facility. Id.

Based on conversations that Verizon has had with Lerner, Defendant "is demanding that Verizon pay SLB Milbank all of the electrical charges incurred by SLB Milbank for the entire Property's electrical service dating back to 2020." Id. ¶ 25.  Verizon contends that Defendant's counterproposal is "contrary to the Agreement" and disregards "the sub-meter," which "indicates Verizon's actual [electrical] usage." Id.

Verizon asserts that Defendant's counterproposal "greatly exceed[s] . . . Verizon's actual electrical use on the property." Id. ¶ 26.  As earlier referenced, invoices from the previous property owner show that Verizon's cost for actual electrical use averaged around $424.17 per month. Id.  And Defendant's first invoice for the nine months averaged out to around $500 per month. Id.  But the amount Defendant now demands equates to a monthly average of $3,500. Id.  "Moreover, Verizon operates similar rooftop communications facilities throughout the United States, as well as within the same general area as the [Milbank] Property," and the average cost of those facilities is between $400 to $500 a month. Id. ¶ 27.

On June 23, 2025, Verizon agreed to pay Defendant $36,000—an amount Verizon contends "greatly exceeds the electrical charges actually incurred"—on the condition that Defendant "l[eft] the power on over the weekend and cancel[ed] the disconnect order." Id. ¶ 28.  Yet Defendant continues "to demand that Verizon pay the additional [$178,578.00]," as outlined in its counterproposal letter. Id.

Based on Defendant's insistence, "Verizon believes that there is a continuing and imminent risk that SLB Milbank will once again shut off power to the Property and/or Instruct [the Otter Tail Power Company] to do so." Id. ¶ 36. Verizon contends that "[c]utting off power to the Property would again deprive Verizon's thousands of customers in the Milbank area of vital telecommunications services indispensable to public safety, business, and ordinary life, resulting in irreparable harm to [its] reputation, business operations, and customers." Id. Thus, Verizon seeks a TRO "to ensure uninterrupted telecommunications services to its many customers in the Milbank area" until the dispute can be resolved.

## II.   Legal Standard

Under Rule 65 of the Federal Rules of Civil Procedure, a district court has broad authority to issue a temporary restraining order. Entergy, Ark., Inc. v. Nebraska, 210 F.3d 887, 898 (8th Cir. 2000). Rule 65 provides:

> **(b) Temporary Restraining Order.**
>
> **(1) *Issuing Without Notice.*** The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> > **(A)** specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> >
> > **(B)** the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.
>
> **(2) *Contents; Expiration.*** Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

6

> **(3)** ***Expediting the Preliminary-Injunction Hearing.*** If the order is issued
> without notice, the motion for a preliminary injunction must be set for hearing
> at the earliest possible time, taking precedence over all other matters except
> hearings on older matters of the same character. At the hearing, the party who
> obtained the order must proceed with the motion; if the party does not, the court
> must dissolve the order.
>
> **(4)** ***Motion to Dissolve.*** On 2 days' notice to the party who obtained the order
> without notice—or on shorter notice set by the court—the adverse party may
> appear and move to dissolve or modify the order. The court must then hear and
> decide the motion as promptly as justice requires.

Fed. R. Civ. P. 65(b).  Plaintiff has provided written notice of its motion for a TRO to Defendant

and Defendant's legal counsel.  Doc. 8; Doc. 8-1; see also Branstad v. Glickman, 118 F. Supp.

2d 925, 936 (N.D. Iowa 2000) (noting how "the fact that notice is provided does not necessarily

mean that the relief granted will be a preliminary injunction rather than a TRO").

In deciding whether to issue a TRO, the Court weighs four factors: "(1) the threat of

irreparable harm to the movant; (2) the state of the balance between this harm and the injury that

granting the injunction will inflict on other parties litigant; (3) the probability that movant will

succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640

F.2d 109, 114 (8th Cir. 1981) (en banc).  Although the Dataphase factors do not apply under the

language of the rule to the decision to grant a TRO, this Court will consider each factor here.

See Kersten v. City of Mandan, 389 F. Supp. 3d 640, 645 (D.N.D. 2019) ("[I]t is well-

established that the court is required to consider the factors set forth in Dataphase Systems, Inc.

. . . in determining whether a temporary restraining order should be granted."); Solomon v.

Campbell, No. 18-cv-4001, 2018 WL 3085171, at *3 n.4 (W.D. Ark. June 22, 2018) ("The four

Dataphase factors are also used to determine whether to issue a temporary restraining order.").

"No single factor is dispositive, as the district court must balance all factors to determine whether

the injunction should issue." Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 699 (8th Cir.

2021) (citation modified). That said, "[t]he focus in considering whether to issue a TRO is whether the moving party "clearly show[s] that immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).

## III. Discussion

### A. Irreparable Harm Absent Injunctive Relief

The first Dataphase factor looks to the "threat of irreparable harm to the movant." Dataphase Sys., Inc., 640 F.2d at 114. Verizon argues that itself and thousands of public users will suffer irreparable harm absent a TRO. Irreparable harm exists "when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Cigna Corp. v. Bricker, 103 F.4th 1336, 1346 (8th Cir. 2024) (quoting Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009)).

Absent a TRO, Verizon risks irreparable harm from Defendant cutting power to its communications facility. Verizon provides wireless and home internet coverage to a 25 square mile region in northeast South Dakota. Doc. 1 ¶ 9. Its customers include families, business, schools, and healthcare providers. Cutting power to Verizon's facility also means cutting off the main method of communication between family members, between businesses and their customers, and healthcare providers from their patients. Aside from the reputational harm, the disruptions and burdens a power outage would cause to Verizon and its customers cannot be adequately calculated in money damages. The threat of additional power outages presents Verizon and its customers an unacceptable risk of harm ahead of a busy and inherently dangerous holiday weekend. This factor, therefore, favors granting a TRO.

## B. Balance of Harm and Injury to Defendant

The second Dataphase factor requires this Court to balance the Plaintiff's threat of irreparable harm against the injury that granting a TRO will inflict on Defendant. Dataphase Sys., Inc., 640 F.2d at 114. At base, this factor asks, "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Id. at 113.

The harm to Verizon and its customers greatly outweighs any harm Defendant may suffer from a TRO. First, a TRO would simply prevent Defendant from cutting off power to Verizon's rooftop communication facility for 14 days. It does not inhibit Defendant from continuing to bill Verizon for the electrical use attributable to Verizon's communication facility. Second, Defendant has a forum available "to litigate any dispute over Verizon's liability for utility charges." Doc. 6 at 14. A TRO would only prevent Defendant's harmful act of cutting power to Verizon's facility. While litigation before a neutral arbitrator may delay payment of monies rightfully owed to Defendant when compared to wrongful acts of self-help, such as extortion, this nominal delay is infinitesimal when compared to the harm of cutting communication off to large swaths of a community over a holiday weekend. As Plaintiff so elegantly put it, "disconnecting power and impairing the ability of thousands of users to communicate outweighs any singular harm SLB Milbank would face." Id. at 15. Thus, the second Dataphase factor supports granting a TRO.

## C. Likelihood of Success on Merits

For the third Dataphase factor, the Court must look to whether the party requesting a TRO is likely to succeed on the merits. See Dataphase Sys., Inc., 640 F.2d at 114. "While no single factor is determinative, the probability of success factor is the most significant." Home

Instead, Inc. v. Florance, 721 F.3d 494, 497 (8th Cir. 2013). For this factor to weigh in

Plaintiff's favor, Verizon need only show they have a "fair chance of prevailing." Lamplighter

Vill. Apartments LLP v. City of St. Paul, 534 F. Supp. 3d 1029, 1034 (D. Minn. 2021) (quoting

Planned Parenthood of Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008)). The

movant need not demonstrate "a greater than fifty percent likelihood that [it] will prevail on the

merits" for this factor to weigh in its favor. Rounds, 530 F.3d at 731 (quoting Dataphase Sys.,

Inc., 640 F.2d at 113). "[W]here the balance of other factors tips decidedly toward plaintiff a

[TRO] may issue if movant has raised questions so serious and difficult as to call for more

deliberate investigation." Dataphase Sys., Inc., 640 F.2d at 113.

Verizon has shown a fair chance of prevailing on the merits. Under the Agreement,

Verizon is only responsible for paying the portion of utilities attributable to its communications

facility. Doc. 1 ¶ 12; Doc. 1-1 at 1. And Verizon has installed a submeter to make reading its

actual electrical usage reasonable. Historically, based on readings from this submeter, the

average monthly cost of Verizon's electrical use has been between $400 to $500. Doc. 1 ¶ 26.

Now, Defendant is seeking payment for almost five years of past energy use at an average

monthly cost of $3,500. Id. ¶¶ 25, 26. Based on this record, it appears that Verizon has a fair

chance of prevailing in its request for Declaratory relief and a permanent injunction.

### D. Public Interest

Under the fourth Dataphase factor, the Court must take the public's interest into account.

Plaintiff operates a federally licensed and regulated rooftop communications facility. This

facility provides wireless communication services to a 25 squire mile area and serves many

customers, including residents, businesses, municipalities, schools, healthcare provides, and first

responders. Access to wireless telecommunication services has become an essential, and often

critical, part of the public's daily life. A landlord's dispute with its lessee over unpaid electrical bills is not a catalyst to disrupt South Dakotans' daily lives, especially over the Fourth of July, a holiday often susceptible to unfortunate accidents. The public's ability to communicate in an emergency should not be put at risk by a landlord-tenant dispute over largely unbilled expenses. Thus, the Public's interest warrants granting a TRO.

### E. Bond

Under Rule 65(c) of the Federal Rules of Civil Procedure, a court may issue a TRO only "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." See also Rathmann-Group v. Tanenbaum, 889 F.2d 787, 789 (8th Cir. 1989) (noting that a bond is mandatory for the issuance of a TRO). The amount of the bond is left to the discretion of the district court. Id. This court finds that a bond in the sum of $5,000 will provide an adequate surety to Defendant for costs associated with seeking to quash an improperly issued TRO.

## IV. Conclusion

Based on the Verified Complaint and the record as it now exits, this Court finds that the balance of equities so strongly favors the movant that court intervention to preserve the status quo is necessary. Therefore, it is hereby

ORDERED that Plaintiffs' Motion for Temporary Restraining Order, Doc. 5, is granted to the extent that Defendant may not cut power to Verizon's rooftop communication facility or threaten to do the same. This Order shall remain in place for no more than 14 days. It is further

ORDERED that Plaintiff provide both Defendant and Defendant's legal counsel (Michael J. Rock) a copy of this Order. It is further

ORDERED that the parties cooperate with this Court to set an evidentiary hearing on the motion for a preliminary injunction at the earliest possible time.  It is finally

ORDERED that in compliance with Rule 65(c), Plaintiff shall post a bond in the sum of $5,000 within forty-eight hours of this Order being filed.


DATED this 2 day of July, 2025.

BY THE COURT:

ERIC C. SCHULTE
UNITED STATES DISTRICT JUDGE